IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Thomas Boyd, ) | |
| ) | Civil Action No. 7:12-1254-JMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Staubli Corporation, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 17). In the complaint, the plaintiff, who is now proceeding *pro se*, alleges that his former employer discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA"), retaliated against him in violation of the ADEA, and breached an employment contract. This case was originally filed in the Court of Common Pleas in Spartanburg County on April 27, 2012, and it was removed to federal court on May 13, 2012.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) DSC, all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

On October 12, 2012, the plaintiff's attorney filed a motion to withdraw, and on November 16, 2012, the defendant filed its motion for summary judgment. On November 26, 2012, the plaintiff's attorney filed a motion seeking a 15-day extension of the deadline for opposition to the motion for summary judgment because the plaintiff had indicated that he would obtain new counsel and thus needed more time to respond. The defendant consented, and the motion was granted, extending the deadline for the plaintiff's response through December 11, 2012. On November 28, 2012, the plaintiff wrote a letter to the court,

asking, in part, that he be allowed to represent himself (doc. 22). That same day, the plaintiff's attorney's motion to withdraw was granted, and an order was issued pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) advising the plaintiff of the motion for summary judgment procedure and the possible consequences if he failed to adequately respond to the motion for summary judgment. On January 2, 2013, the plaintiff filed a 43-page response in opposition to the motion for summary judgment (doc. 26). On January 18, 2013, after asking for and receiving an extension of time, the defendant filed a reply to the plaintiff's response (doc. 44).

## **FACTS PRESENTED**

Defendant Staubli Corporation is an international corporation with its North American headquarters in Duncan, South Carolina. Among other things, the defendant manufactures and sells connectors for industrial applications, such as tool changers and other products for connecting fluid, gas, and electrical power to various kinds of machinery.

The plaintiff was hired in 2001 as a sales engineer (pl. dep. 6).[1] Shortly after he was hired, the defendant discovered that the plaintiff had received a DUI and had lost his driver's license. As driving is an essential function of the job, the plaintiff was terminated (*id.* 7). After he was terminated, the plaintiff received a provisional license and was rehired in 2001 (*id.* 8). For the following ten years, the plaintiff had several direct supervisors, but throughout this period, he was also supervised by Fluid Connector Division Manager Andreas Brake.

In early 2011, the defendant formed a new automotive division tasked with establishing a presence in the United States' automotive market for a robotic tool changer (Brake dep. 19). As part of this new division, the defendant created the position of "Key Account Manager," who would be responsible for promoting the tool changer to the

---

[1] Citations to the plaintiff's and Andreas Brake's depositions are to the complete documents contained in ECF document 53.

2

defendant's key current and prospective accounts in the automotive industry. The defendant offered to promote the plaintiff to the new position (*id.*). In making the offer, Brake sent the plaintiff an e-mail on February 1, 2011, which stated in pertinent part:

> To make it short, 80K for the first three years unless you exceed sales then I would switch you over [to commissions]. Secondly if there are MPS opportunities there are yours but the main focus should be the automotive and here it is important to start building relationships right away – mainly at BMW.

(Marc Kruse aff., ex. A). As reflected in Brake's email, BMW's manufacturing plant in Greenville, South Carolina, was the defendant's primary target for the tool changer, and pursuing BMW would be the most important part of the plaintiff's new job (Brake dep. 20).

On April 12, 2011, the plaintiff signed a letter accepting the position (Kruse aff., ex. B). The plaintiff also requested and was granted a larger territory and the authority to call on certain customers on whom he had called previously (*id.*; pl. dep. 35-36). The plaintiff was 50 years old when he accepted the defendant's offer, and Brake was 49 years old at that time. The plaintiff understood the defendant's offer to mean that he would be paid at least $80,000.00 per year for the next three years, so long as he remained employed by the defendant (pl. dep. 41). The plaintiff admits that the defendant's offer letter did not guarantee that he would be employed for three years (*id.* 41-42, 45).

On or about April 12, 2011, the plaintiff began his new role as Key Account Manager (pl. dep. 43). The plaintiff's immediate supervisor became Marc Kruse ("Kruse"), the defendant's Automotive Sales Manager (Kruse aff. ¶ 5). Kruse made clear to the plaintiff that developing relationships with the major automotive manufacturers in the area was an extremely important part of his new job (*id.* ¶ 9). The plaintiff was expected to visit automotive plants and begin building relationships with key personnel at each company, particularly BMW and Volvo, which likely had a need for products sold by the defendant (*id.*).

In May 2011, the defendant sent the plaintiff to Germany for two weeks to train with company personnel who had the most experience with the defendant's tool changers and with customers like BMW, Volvo, and others (Kruse aff. ¶ 7; pl. dep. 41-42). Shortly thereafter, the defendant prepared an additional week-long training program for the plaintiff in Duncan, South Carolina, along with additional on-the-job training opportunities (Kruse aff. ¶ 7).

On July 21, 2011, the plaintiff sent an email to the defendant's Chief Executive Officer, Joe Gemma, complaining that he had been treated unfairly by Brake (Kruse aff., ex. C). According to the plaintiff, he spoke to Gemma on the telephone on July 20, 2011, and Gemma told him to send the email with the pertinent information in it (pl. resp. m.s.j. 5). Specifically, the plaintiff claimed that Amanda Bradshaw, another salesperson for the defendant, had been given the authority to sell a specific type of coupling plate to one of the defendant's customers, Eagle Bend, for significantly less than the plaintiff had been authorized to sell the same product (Kruse aff., ex. C). The plaintiff felt that the allegedly different pricing was unfair and that it had contributed to a drop in his sales (pl. dep. 92). In his email, the plaintiff accused Division Manager Brake of lying to him, "cheating" him, and keeping him in the dark regarding product pricing (*id.*).

The plaintiff also submitted several pages of "evidence" that he claimed was proof of his allegations. A meeting was scheduled between the plaintiff, Gemma, and Brake for August 4, 2011. At this meeting, the defendant learned that the plaintiff had obtained the documents using the defendant's Customer Reporting Management ("CRM") software, to which he had recently gained access in his role as Key Account Manager (pl. dep. 60-62). The plaintiff alleges in his complaint that he asked in the August 4, 2011, meeting whether the price discrepancy had to do with his age (comp. ¶ 7).

Gemma and Brake explained to the plaintiff that he was mistaken about Bradshaw's sales efforts and that he and Bradshaw were not competing for the same sales

4

(Brake dep. 22). The plaintiff sold the defendant's products to a specific Eagle Bend plant in Tennessee, within his sales territory, as part of his weekly sales duties,[2] while Bradshaw was tasked with promoting the defendant's products to Eagle Bend's parent company, Cosma International ("Cosma"), in Detroit, Michigan (*id.* 22-23).

According to Brake, shortly before Bradshaw's presentation to Cosma, the defendant learned that a previously-unknown Turkish competitor had copied one of its multicoupling plates and was drastically undercutting its prices, causing a sharp drop-off in the defendant's sales to Cosma and its subsidiaries, including Eagle Bend (Brake dep. 24-25). Although initially resistant, the defendant's management ultimately decided to lower its prices in order to compete (*id.*). If the defendant won the project with Cosma, then all of Cosma's plants, including the Eagle Bend plant that was part of the plaintiff's territory, would be required to use the defendant's products, and the plaintiff would get sales commissions within his territory. However, Bradshaw's proposal was unsuccessful, and the defendant did not win the opportunity to become Cosma's standard supplier (*id.* 23-25).

The plaintiff claims that the defendant gave Bradshaw a 50% discount on pricing for her presentation to Cosma in March 2010 on exactly the same type of multicoupling plates that he had previously sold to Eagle Bend. Since he did not get this discount in pricing, the plaintiff claims he was therefore unable to sell the multicoupling plates to Eagle Bend in April 2010 (pl. resp. m.s.j. 6-8, ex. 7.2, 7.3, 7.6, 7.10; *see* doc. 26-7 at pp. 1-2).

After the meeting, the plaintiff sent a written apology to Brake and Gemma (pl. dep. 63- 65; *see* doc. 53-1 at pp. 74-75). In response, Gemma confirmed that the plaintiff's

---

[2] In July 2010, the plaintiff sent his contact at Eagle Bend an email accusing Eagle Bend of reverse engineering the defendant's products and misappropriating their design. After that time, the plaintiff's contact would no longer work with the plaintiff (pl. dep. 16-20; doc. 53-1 at p. 48). According to Brake, a different salesperson, Jeff Franz, thereafter called on Eagle Bend (Brake dep. 27).

5

accusations of unfairness were a misunderstanding, and, as discussed in their meeting, he provided the plaintiff with additional contact information for BMW personnel. Gemma instructed him to continue to focus on cultivating contacts at BMW as the defendant's biggest target (*id.* 66-67; *see* doc. 53-1 at p. 76). The plaintiff also received a written warning for his inappropriate, accusatory email and for accessing Bradshaw's call reports on the CRM system for inappropriate purposes (*id.* 63; *see* doc. 53-1 at p. 73).

In his affidavit, Kruse attests that he constantly urged the plaintiff to visit BMW, but the plaintiff resisted these efforts because he felt that once he visited a prospective account the company would call the defendant if they needed the product, and he resisted going back for additional visits (Kruse aff. ¶ 10). Kruse and the defendant's management felt otherwise and regularly instructed the plaintiff to continue seeking appointments and cultivating relationships with prospective customers as well as to seek new contacts at the defendant's established accounts (Brake dep. 10, 13). In early August 2011, Kruse instructed the plaintiff to revisit Volvo (pl. dep. 71-72), a major automotive manufacturer in the Southeast and one of the defendant's primary prospective customers. The plaintiff insisted there would be no value in his going to visit Volvo to promote the defendant's tool changer because Volvo had no projects going on involving the use of the defendant's products (*id.*).

On August 17, 2011, the plaintiff reported to Kruse via email regarding a face-to-face meeting he had with two Volvo representatives in response to Kruse's request that he cultivate new contacts (Kruse aff., ex. D). The plaintiff reiterated that he felt the defendant had the correct contacts at Volvo and that continuing to call on those contacts was a waste of his time, telling Kruse, in pertinent part:

> It is my position that Volvo is aware of the features and benefits of the MPS630 [tool changer] and that when they need to do work on one of their new cells, we will get the call to quote.

6

> Pushing them by repeatedly calling them when they are not ready to work on projects is aggravating to them and is the wrong thing to do. . . .
>
> I will email Wayne [from Volvo] next month to ask if he has any news.

(*Id.*).

On August 23, 2011, the plaintiff emailed Kruse after receiving a follow-up call from Volvo. The plaintiff admitted to Kruse that he learned Volvo was slated to begin running trials with products from two of the defendant's competitors, including a trial on their primary competitor's tool changer (pl. dep. 72-75; *see* doc. 53-1 at pp. 79-80). The plaintiff was surprised by this (pl. dep. 75). The plaintiff reported that he would "step out of [his] comfort zone" and begin calling on Volvo regularly, as he had been instructed, in an effort to get Volvo to include the defendant in its tool changer trial (doc. 53-1 at pp. 79-80).

According to Kruse, it was apparent during this time period that the plaintiff was not satisfied with his job. He constantly complained to Kruse and other members of management and continued to refuse to make the visits necessary to make his position successful (Kruse aff. ¶ 12). On Wednesday, August 24, 2011, the plaintiff sent the following email to a co-worker:

> Dude, I am not well, this new tool changer job sucks moose cock in hell. They changed the job description after we signed up to it and now all I can call on is body in white automotive manufacturing and a few other automotive suppliers. I have the entire east and northeast. All tolled, maybe I have 20 companies to call on. You can phone call 20 companies every day of your life trying to set up a Staubli appointment, it is a recipe for failure, and I ain't happy about it.
>
> Hope things are better on your side. By the way, I sure would like a job selling electrical connectors. I am trainable, I promise.

(Kruse aff., ex. E; *see also* pl. dep. 78). The plaintiff stated in his deposition that he "was probably just going to decide to quit" on the following Thursday or Friday (pl. dep. 92, 115).

According to the plaintiff, he was having an "ongoing problem . . . with Marc Kruse about an expense report [he] submitted in late July" (pl. reps. m.s.j. 16). He claims Kruse sent the expense report back to him three times saying it contained errors, although the plaintiff had never had a prior problem with his expense reports. He claims the expense report problem "was manufactured to harass [him]" (*id.*).

On Friday, August 26, 2011, Kruse sent the plaintiff the following email at 10:07 a.m. with instructions for the following Monday:

> Subject: BMW Visit on next Monday afternoon
>
> Tom, please arrange a meeting at BMW with David Kraaynebrink for Monday, (August 29th) afternoon to talk about:
>
> 1. All interfaces for the MPS630 (Please print out and bring all information you have received so far).
>
> 2. BMW test criteria for the MPS test.
>
> 3. In addition, I would like to visit Paul Abrams as well.
>
> I will join you for this visit. Please confirm this meeting ASAP. Before we go to the BMW meeting we will need to meet in our Duncan office to prepare for this meeting. Be there two hours before the BMW meeting.
>
> Please be available after the meeting to discuss what happened at Volvo. This meeting will be conducted in our office in Duncan. Thank you.
>
> Sincerely,
>
> Marc Kruse
> Sales Manager, Automotive

(Kruse aff., ex. F). Division Manager Brake and Martin Bergmueller, the plaintiff's counterpart at the defendant's location in Germany, were copied on the email. The plan for the meeting was to discuss why the defendant's competitors were having more luck promoting their tool changers than the plaintiff (Brake dep. 6-7).

8

The plaintiff received the email that afternoon at approximately 2:00 p.m. on Friday, August 26th (pl. dep. 84). Despite being instructed to "confirm ASAP," the plaintiff did not respond. Kruse sent the plaintiff a follow up email, which set a firm time for a meeting at the defendant's headquarters the following Monday morning (Kruse aff., ex. G). The plaintiff received this email and knew that Kruse's request was urgent (pl. dep. 92), but he did not confirm the Monday meeting. The plaintiff admits that he was capable of calling Kruse right away or emailing him back when he received the email (*id.* 85). The plaintiff waited more than two days, until Sunday at 10:43 p.m., to respond with the following:

> Marc, I received your e-mails late Friday afternoon while driving home.
>
> It is completely unreasonable for you to tell me Friday afternoon that you want a meeting at BMW on Monday.
>
> Your request came too late. I am having private meetings Monday, Tuesday, Wednesday and taking Thursday and Friday off.
>
> Kind regards,
> Tom Boyd

(Kruse aff., ex. H).

Kruse did not receive the plaintiff''s response until Monday morning, August 29, 2011, two hours before the meeting was scheduled to occur (Kruse aff. ¶ 14; pl. dep. 85-86). The plaintiff admitted in his deposition that the "private meetings" were a fabrication (pl. dep. 88, 92). He claims that he planned to call the defendant's French division for some reason, but he had no meetings scheduled (*id.*).

The plaintiff states that his contacts at BMW did not want to see them and that Kruse "had pissed them all off" (pl. dep. 87-88). Thus, he claims that there was no reason to have a meeting and that Kruse was "just trying to give [him] something that [he] couldn't do for the express reason so they could terminate [him]" (*id.* 88).

9

After receiving the plaintiff's email on Monday morning, Kruse attests that he immediately tried to call the plaintiff, but he got no answer or return call (Kruse aff. ¶ 15). The plaintiff disputes this, saying that he was available with his phone on all day (pl. resp. m.s.j. 22). Kruse then called Brake on his way to work and reported that the plaintiff not only failed to set up an appointment at BMW, but he also did not intend to come to the meeting Kruse had scheduled at the office in Duncan (Brake dep. 17-18). The plaintiff also stated that he planned to take the entire week off without requesting the time and approval from management (*id.* 17; Kruse aff. ¶ 15)

After discussing the matter with Kruse, Brake instructed Roger Varin, the defendant's Chief Financial Officer, to terminate the plaintiff's employment (Brake dep. 46). Varin spoke with the plaintiff late in the afternoon (pl. dep. 97-100). Varin then sent the plaintiff an email terminating his employment as of that day, August 29, 2011 (doc. 53-1 at pp. 92-93; pl. dep. 98-99).

## **APPLICABLE LAW AND ANALYSIS**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds by* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

### *Age Discrimination*

The *McDonnell Douglas* burden-shifting framework applies to claims under the ADEA.[3] *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir.2004). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case by producing evidence that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing satisfactorily at the time of his adverse employment action; and (4) similarly situated employees outside the plaintiff's protected class received more favorable treatment. *Atkins v. Holder*, C.A. No. 4:10-1296-JMC, 2012 WL 4380849, at *7 (citing *Hill*, 345 F.3d at 285). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to set forth a legitimate, non-discriminatory reason

---

[3] The plaintiff states he has no direct evidence of age discrimination (pl. dep. 46).

for the adverse employment action. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir.2004). Then, to avoid summary judgment, the plaintiff must produce evidence that the defendant's stated reason for the adverse action is pretextual. *Id.* However, " '[t]he ultimate burden of persuading the trier of fact that the [defendant] intentionally discriminated against [the plaintiff] remains at all times with [the plaintiff].' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253).

The plaintiff alleges that the defendant violated the ADEA by allowing Amanda Bradshaw, who is younger than the plaintiff, to sell its products to Eagle Bend at a lower price, thereby undercutting his potential sales and related commissions[4] from Eagle Bend (pl. dep. 59). "An adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.' " *Holland v. Washington Homes*, 407 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Therefore, for the alleged disparate pricing between the plaintiff and Bradshaw to constitute adverse action, the plaintiff must provide probative evidence that his compensation was actually adversely affected.

The plaintiff argues that he lost "$7200 in commissions on a large order for multicoupling plates to one of my top three accounts due to pricing that was well above pricing that was available to another representative, Amanda Bradshaw" (doc. 26-7 at p. 1). He also argues that by not getting the Eagle Bend order in April 2010, he did not achieve $1,000,000 in total sales, and thus he did not get a 4% commission on sales for the next year as opposed to 3% commission (*id.*).

---

[4]In his complaint, the plaintiff also alleged that his termination was the product of age discrimination (comp. ¶¶ 22-23). In his response in opposition to the motion for summary judgment, the plaintiff states that the adverse employment action at issue in his age discrimination claim is the allegedly unfair pricing of the multicoupling plates. He further states that his termination was retaliation for complaining about discrimination (pl. resp. m.s.j. 35; doc. 26-7 at p. 1). Accordingly, the plaintiff's termination from employment will only be considered with regard to his retaliation claim.

However, as argued by the defendant, the plaintiff's argument turns on his speculation that he would have made the sale to Eagle Bend and received the commissions at issue had he been permitted to quote the same price as Bradshaw. The plaintiff has failed to present such evidence. The record before the court shows that Bradshaw called on Cosma International, Eagle Bend's parent company, and even if Bradshaw had completed the sales, which she did not, those sales would not be lost opportunities for the plaintiff as he would have benefitted from the sale of the defendant's products to Eagle Bend had Bradshaw's proposal been successful. The defendant has also presented evidence that the company discovered in late 2010 that a Turkish competitor was undercutting its prices on multicoupling plates, and that was why Bradshaw's proposal was unsuccessful. Furthermore, the evidence shows that the plaintiff's fractured relationship with Eagle Bend was at least partly of his own doing. In July 2010, the plaintiff sent his contact at Eagle Bend an email accusing the company of reverse engineering the defendant's products and misappropriating their design. After that time, the plaintiff's contact would no longer work with the plaintiff, and a different salesperson thereafter assumed responsibility for calling on Eagle Bend.

Based upon the foregoing, the plaintiff has failed to show that he suffered an adverse employment action as a result of the allegedly discriminatory pricing. *See, e.g. Holland*, 407 F.3d at 219 (rejecting plaintiff's claim that reassignment constituted adverse action and affirming summary judgment because plaintiff failed to provide evidence that his compensation was adversely affected by the move); *James*, 368 F.3d at 376-77 (rejecting the plaintiff's claim that reassignment and performance evaluation constituted adverse employment action when no evidence that either had a significant detrimental effect on his compensation or advancement opportunities); *Abrams v. Wachovia Corp.*, 3:08-4073-JFA-PJG, 2010 WL 2622437, at * 3 (D.S.C. June 25, 2010) (finding that the plaintiff's written reprimands did not constitute adverse employment action because, although the reprimands

could have negatively impacted promotion within the company, they did not actually have that effect).

Furthermore, even if the plaintiff's compensation had been adversely affected by the difference between his and Bradshaw's pricing, the discrepancy fails to raise the inference of discrimination because the plaintiff and Bradshaw were not "similarly situated." "In order for an employee to be similarly situated, 'a plaintiff must establish that other employees were similarly situated in all relevant respects [including] that they dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " *See Atkins*, 2012 WL 4380849, at *7 (quoting *Ward v. City of N. Myrtle Beach*, 457 F.Supp.2d 625, 643 (D.S.C.2006)). "The point of such comparisons is this: because the classes are similarly situated in all relevant respects except protected class status (e.g. gender or race), there arises a rational inference of discrimination on the basis of that status." *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995).

The plaintiff's argues that "[Bradshaw] quotes plates, I quote plates. The same job title, at the same time in history, Spring 2010" (doc. 26-7 at p. 5). However, the defendant has presented evidence that the plaintiff and Bradshaw were quoting multicoupling plates to different customers for different purposes. The plaintiff quoted prices to Eagle Bend, a Cosma subsidiary and an established customer of the defendant's tool products for which, until 2010, the defendant had no significant competition. Bradshaw's pricing at issue was developed for Cosma, Eagle Bend's parent company in a different sales territory (Brake dep. 22-23). Further, if Bradshaw had been successful, the defendant's multicoupling plates would have been the corporate standard to be used in every Cosma plant, including Eagle Bend (*id.* 22). The plaintiff has failed to show that the defendant's evidence of differentiating circumstances justifying different quote prices is "simply false" as he contends (doc. 26-7 at p. 5).

14

Furthermore, even if the plaintiff could establish a *prima facie* case of age discrimination, he has failed to show that the defendant's legitimate, nondiscriminatory reason for permitting Bradshaw to quote plates for a lower price in April 2010 was pretext for discrimination against the plaintiff because of his age. "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.  However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. *Id*.  Accordingly, the court must evaluate "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id*. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." *Merritt*, 601 F.3d at 294-95.

Here, the plaintiff relies solely on his disagreement with the defendant's explanation for the pricing difference and Bradshaw's younger age as the basis for his claim, arguing, "There is no judge or jury anywhere that will agree that a 50 year old male trying to sell a multicoupling plate at $24,400, has the same ability to be successful as a 30 year old female selling the same multicoupling plate for $13,000" (doc. 26-7 at p. 2). The plaintiff has failed to present any evidence whatsoever that the defendant's explanation is false or that the pricing was otherwise motivated by the defendant's age-based preferential treatment and not by legitimate business reasons.  Accordingly, summary judgment should be granted on the plaintiff's ADEA discrimination claim.

15

***Retaliation***

The plaintiff also alleges that the defendant terminated his employment because he allegedly asked whether the pricing disparity between he and Bradshaw was related to his age. To establish a *prima facie* case of retaliation in violation of the ADEA, the plaintiff must show that: (1) he engaged in a "protected activity"; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006).  If the plaintiff establishes a *prima facie* case, then the "legitimate, non-discriminatory reason" and "pretext for discrimination" steps from the *McDonnell Douglas* burden-shifting scheme are applicable to his retaliation claim.  *Id.*

The plaintiff alleges in his complaint that, when meeting with Gemma and Brake on August 4, 2011, regarding the disparity in prices offered to Eagle Bend between he and Bradshaw, he "inquired if it had anything to do with his age" (comp. ¶ 7).  However, the plaintiff has failed to come forward with any evidence supporting his claim.  In the July 21, 2011, email to Gemma, in which the plaintiff claimed he had been "lied to, cheated, and kept in the dark" by Brake for years and which prompted the August 4th meeting, the plaintiff made no reference whatsoever to his age or Bradshaw's age (Kruse aff., ex. C).  While the plaintiff did allege in the email that Brake had "discriminated" against him, he defined the alleged discrimination and the reason for his complaint as follows:  "Being pushed out of a company because you cannot sell is one thing, finding out the reason you cannot sell is because other people working for the same company are presenting hugely better pricing, for the same bit of business, is quite another" (*id.*).  Age was not the issue - as the subject line of his email indicates; the plaintiff's complaint was "a question of fairness," not age discrimination.  Further, the record shows that the plaintiff never testified in his deposition that he mentioned his age or questioned whether or not the alleged disparity in pricing was related to age in the August 4th meeting with Gemma and Brake (pl. dep. 59).  The plaintiff

16

acknowledged that Gemma and Brake addressed the alleged pricing unfairness, although not to his satisfaction, but he never suggested they discussed age (pl. dep. 62-64).

As argued by the defendant, the plaintiff's allegation that he complained of "discrimination," without mentioning that he believed the alleged discrimination to be age-related, falls short of constituting protected activity. *See, e.g. McNair v. Computer Data Systems, Inc.*, No. 98–1110, 1999 WL 30959, at * 5 (4th Cir. Jan. 26, 1999) (holding that opposition clause in Title VII "requires that the employee at least have actually opposed employment practices made unlawful by Title VII.  That is to say, the clause protects opposition neither to all unlawful employment practices nor to practices the employee simply thinks are somehow unfair.").

Even if the plaintiff could establish a *prima facie* case of retaliation, the plaintiff has failed to show that the reason given for his termination from employment was pretext for retaliation.   The sole evidence provided by plaintiff to link his alleged protected activity and termination is his testimony that Marc Kruse required him to resubmit several expense forms in the time period between those two events (comp. ¶ 9). However, Kruse was not at the meeting where the plaintiff allegedly questioned whether the alleged unfair treatment was age-related (pl. dep. 62), and there is no evidence that Kruse knew about his alleged reference to age discrimination nor any evidence that the expense report issue was related to the plaintiff's allegation about age discrimination.

The plaintiff does not offer any probative evidence that the facts underlying the defendant's explanation for his discharge were false; the material facts are undisputed. The plaintiff admits that he received Kruse's email at 2 p.m. on Friday, August 26, 2011, regarding the meeting with BMW, and he deliberately chose not to respond.  The plaintiff admits that he responded at 10:43 pm on Sunday, August 28th, knowing that Kruse would not receive the email until the morning the meetings were to be scheduled (pl. dep. 84-86). The plaintiff also admits that he lied about "private meetings" that kept him from scheduling

the other meetings. He acknowledges that BMW was the defendant's biggest target customer and that pursuing BMW was the most important part of his job as Key Account Manager. The plaintiff also admits that the meeting with Kruse and Brake was in part to discuss his failure to respond to instructions to pursue Volvo aggressively. While the plaintiff argues that "[i]t should be clear there was no legitimate need for the meeting" (pl. resp. m.s.j. 17), he has failed to present any evidence supporting this argument.

Based upon the foregoing, the defendant is entitled to summary judgment on the plaintiff's retaliation claim.

***Breach of Contract***

Lastly, the plaintiff alleges in his complaint that the offer letter for the Key Account Manager position on March 25, 2011, constituted a three-year employment contract, which the defendant allegedly breached by terminating him without "cause" (comp. ¶ 16).[5] The plaintiff acknowledged in his deposition that the defendant retained the right to terminate him at any time and that the offer letter did not guarantee that he would be employed for three years (pl. dep. 41-45). The three-year provision merely informed the plaintiff that his compensation would not drop below $80,000 for the following three years, so long as he remained employed (*id.* 41).

If, as here, an employment contract is one for "indefinite duration," meaning that the employment has no fixed term, then the employment presumptively remains at-will, and both parties are free to terminate the employment relationship at any time, with or without cause. *See Cape v. Greenville County Sch. Dist.*, 618 S.E.2d 881, 882-83 (S.C. 2005). That presumption is removed only if the parties' contract includes a provision that alters the parties' absolute right to terminate at any time. *Id.* The plaintiff's offer letter includes no limitations on either party's right to end the employment relationship. Therefore,

---

[5]In his response to the motion for summary judgment, the plaintiff did not address the defendant's motion as to his breach of contract claim.

18

the plaintiff remained an at-will employee, and the defendant was free to terminate his employment for any reason or no reason at all.

Furthermore, even if the plaintiff had a contract that required "cause" to terminate his employment, his conduct on August 26-29, 2011, undoubtedly constituted such cause. *See Conner v. City of Forest Acres*, 560 S.E.2d 606, 611 (S.C. 2002) ("When an employment contract is terminable only for 'cause,' the contract is breached only if the employer lacked a reasonable, good faith belief that sufficient cause existed to terminate."). Accordingly, the defendant is entitled to summary judgment on the plaintiff's breach of contract claim.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 17) be granted.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

July 31, 2013
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 300 East Washington St, Room 239
> Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).